# KLIEBENSTEIN

# EXHIBITS 1-3

# KLIEBENSTEIN

# EXHIBIT 1

# TO BE FILED FOLLOWING ENTRY OF ORDER ON APPLICATION FOR LEAVE TO FILE UNDER SEAL

# KLIEBENSTEIN

# EXHIBIT 2

# TO BE FILED FOLLOWING ENTRY OF ORDER ON APPLICATION FOR LEAVE TO FILE UNDER SEAL

# KLIEBENSTEIN

# EXHIBIT 3

# In The Matter Of:

*Pinkette Clothing, Inc. v.*
*Cosmetic Warriors Limited*

---

*Dr. Jonathan D. Hibbard*
*October 21, 2016*

---

*195 State Street • Boston, MA 02109*
*Nationwide - Worldwide*
*888.825.3376 - 617.399.0130*
*www.court-reporting.com*



Original File Joanthan D. Hibbard 10-21-16.txt
Min-U-Script® with Word Index

1

1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3

4                                    Case No.:

5      PINKETTE CLOTHING, INC.,        2:15-cv-04950-SJO-AJW

6                    Plaintiff,

7                v.

8      COSMETIC WARRIORS LIMITED,

9                    Defendant.

10

11         DEPOSITION OF DR. JONATHAN D. HIBBARD, a witness

12    called by and on behalf of the Defendant, taken

13    pursuant to Rules 26(b)(4) and 30(b)(1) of the

14    Federal Rules of Civil Procedure, before Maria P.

15    Manning, CSR and Notary Public in and for the

16    Commonwealth of Massachusetts, at O'BRIEN & LEVINE

17    COURT REPORTING SERVICES, 195 State Street, 5th

18    Floor, Boston, Massachusetts, 02109 on

19    October 21, 2016, commencing at 10:03 a.m.

20

21

22

23

24

2

```
 1   A P P E A R A N C E S:

 2

 3        LTL ATTORNEYS LLP

 4        (by David A. Crane, Esq.)

 5        300 South Grand Avenue, 14th Floor

 6        Los Angeles, California 90071

 7        (213) 612-8900

 8        david.crane@ltlattorneys.com

 9        for the Plaintiff.

10

11        MERCHANT & GOULD P.C.

12        (by Heather J. Kliebenstein, Esq.)

13        3200 IDS Center

14        80 South Eighth Street

15        Minneapolis, Minnesota 55402-2215

16        (612) 332-5300

17        hkliebenstein@merchantgould.com

18        for the Defendant.

19

20

21

22

23

24
```

3

1                       I N D E X

2    WITNESS:

3    DR. JONATHAN D. HIBBARD

4    Examination by:                              PAGE

5    Ms. Kliebenstein                               4

6

7                     E X H I B I T S

8    No.                                          PAGE

9    Exhibit 262    Rebuttal report of Jonathan D.    4

10                  Hibbard, Ph.D.

11   Exhibit 263    Dr. Joachimsthaler's report      80

12

13

14          Exhibits were retained by the Stenographer

15   and returned to MS. KLIENBENSTEIN.

16

17

18

19

20

21

22

23

24

```
 1                    P R O C E E D I N G S
 2               (WHEREUPON, Exhibit 262, received and
 3               pre-marked for identification.)
 4
 5                    JONATHAN D. HIBBARD
 6
 7      a witness, having been satisfactorily identified
 8   by the production of a driver's license, was first
 9   duly sworn, was examined and testified as follows:
10
11                    EXAMINATION
12   BY MS. KLIENBENSTEIN:
13      Q.  Good morning, Dr. Hibbard.
14      A.  Good morning.
15      Q.  Welcome to your deposition.
16      A.  Thank you.
17      Q.  Have you ever been deposed before?
18      A.  Yes.
19      Q.  How many times?
20      A.  Several.  Two or three.  I can't remember.
21   It's been a while.
22      Q.  So you know the drill.  I'll ask you
23   questions, you answer them.  If you need a break at
24   any time, just let me know.  If there's a question
```

```
 1   that you don't understand, feel free to ask me to

 2   rephrase it.

 3           Is this there anything today that would

 4   prevent you from providing your full testimony?

 5      A.  No.

 6      Q.  So you mentioned that you've been deposed two

 7   or three times before.

 8           Can you recall what matters those depositions

 9   took place in?

10      A.  At the moment, no.

11      Q.  How long ago were they?

12      A.  Somewhere around nine, ten, twelve years ago.

13      Q.  Were they civil lawsuits?

14      A.  They were.

15      Q.  Were you acting as an expert witness?

16      A.  I was not.

17      Q.  In what capacity were you acting?

18      A.  I believe I was designated as a consulting

19   expert.

20      Q.  So you were deposed or you weren't deposed?

21      A.  I was deposed.

22      Q.  You were deposed as a consulting expert.

23           And is that in both of those depositions you

24   were a consulting expert?
```

Dr. Jonathan D. Hibbard - October 21, 2016                    41

```
 1      Q.  And the second is that the strength and the
 2   status of the LUSH brand in the U.S. market was not
 3   strong in 2003 to 2004.
 4        Is that the second prong of your opinions in
 5   this case?
 6      A.  Yeah.  The second prong is that it's nowhere
 7   near as strong as it potentially is in '15, '16.
 8      Q.  And it's limited to that time period, 2003 to
 9   2004, correct?
10      A.  The analysis I did was I tried to use 2003,
11   2004 data.
12      Q.  To make a conclusion about the strength and
13   status of the LUSH brand in 2003 to 2004, correct?
14      A.  Yes.  Correct.
15      Q.  And so this report does not express any
16   opinions on the status or strength of the LUSH brand
17   after 2004?
18              MR. CRANE:  Objection.  Vague.
19              THE WITNESS:  Can you specify for
20         me a little?
21   BY MS. KLIENBENSTEIN:
22      Q.  Sure.  I'm just trying to understand the
23   temporal metes and bounds of your opinions in this
24   case.  So in the second prong, your opinions talk
```

1   about the strength and status of the LUSH brand for

2   2003 to 2004.

3          And so my question is your opinions about the

4   strength and status of the LUSH brand are limited to

5   that time period, 2003 to 2004?

6      A.  I would say yes.

7      Q.  So to ask the first question again, you don't

8   have any opinions in this report about the status and

9   strength of the LUSH brand after 2004?

10                 MR. CRANE:  Objection.  Asked and

11             answered.

12                 THE WITNESS:  I think, I'm not

13             sure.  I may have included a little bit

14             of 2005 in there.  But certainly I did

15             not use any data, you know, that was

16             past 2003, 2004 or maybe a little in

17             2005.

18   BY MS. KLIENBENSTEIN:

19      Q.  So moving on to paragraph 13, under

20   Section A.

21          To quote your report, it says, "I believe the

22   relevant time period in which to assess CWL's LUSH

23   Cosmetics/Toiletries brand status is 2003 to 2004 and

24   not 2013 to 2016?"

1              That's based on law provided to you from

2      counsel, correct?

3          A.  Correct.

4          Q.  And let's assume that the law on that time

5      period, that only 2003 to 2004 is wrong.  Let's just

6      assume that it's wrong.

7              Your criticisms based on that point would

8      then not be pertinent to this matter, correct?

9          A.  (Pause.)

10         Q.  And I'm not talking about the second prong of

11     your report, your own independent analysis of the

12     status in 2003, setting that aside.

13             This first area deals with your criticisms of

14     Dr. Joachimsthaler for not looking at 2003 to 2004,

15     correct?

16         A.  My criticism for only looking at 2014, 2015,

17     '16 data.  So that's my criticism of him.

18         Q.  Okay.  Because the relevant time period is

19     2003, 2004.

20         A.  Correct.

21         Q.  Based on the law that you've been provided.

22         A.  Correct.

23         Q.  And so my question is let's assume that that

24     law is incorrect, that looking at 2013 to 2016 is

1    legally relevant to this case.

2            Do you understand that assumption?

3       A.   Okay.

4       Q.   Would your criticisms in this first part be

5    the same?

6                MR. CRANE:  Objection.  Incomplete

7            hypothetical.  Vague and ambiguous and

8            confusing.

9                THE WITNESS:  Answer or not?

10               MR. CRANE:  You can answer to the

11           extent you understand the question.

12               THE WITNESS:  Okay.  So as I

13           understand your question, if the law is

14           not correct, then the analysis that

15           I've done tied to 2003, 2004 may not be

16           as useful.

17   BY MS. KLIENBENSTEIN:

18       Q.   And looking at this flaw number one issue,

19   you say it may not be as useful.  In what ways could

20   your analysis from paragraphs 13 through 53 be

21   useful, assuming that that law is wrong?

22               MR. CRANE:  Objection.  Incomplete

23           hypothetical.

24               Counsel, can you specify for the

Dr. Jonathan D. Hibbard - October 21, 2016                    56

1   good thing.

2        Q.   So let's move to the brand identity system.

3             This framework -- have you ever heard of this

4   framework before, before working on this case?

5        A.   Yes.

6        Q.   And what do you know about that framework?

7        A.   I mean, I know about the framework.  It's a

8   framework in branding.

9        Q.   And what would that framework be used for?

10       A.   I think you could use it for a number of

11  things.  I guess you could use it to assess a brand.

12  Sort of like a brand audit.

13       Q.   When you say a "brand audit," what does that

14  mean?

15       A.   Basically trying to understand where the

16  brand is at now.

17       Q.   What its target consumers would think about

18  it?

19       A.   Yeah.  Exactly.

20       Q.   Have you ever used that framework before?

21       A.   I have not.  I've used elements of it, but I

22  haven't used Erich's particular framework.

23       Q.   And what elements have you used of this

24  framework before?

1        A.   Can I look through and tell you?

2        Q.   Oh, sure.

3        A.   Okay.

4        Q.   Yes.  Feel free to look.

5        A.   So the brand as person I've used, because

6   typically that's more referred to as brand

7   personality.  So there's a large literature on brand

8   personality.

9        Q.   Um-hmm.

10       A.   And then brand as symbol.  Again, it's sort

11  of a well-known literature on brand as symbol, so

12  that would be something that probably many

13  consultants, academics would use as a way to examine

14  brands.

15       Q.   When preparing your report, did you read any

16  research on how to apply the brand identity system

17  framework?

18       A.   I read Erich's book.  Well, I read David

19  Aaker's book with Erich.

20       Q.   In your analysis under the brand identity

21  system, you're operating assumption was that the

22  proper time frame within which to analyze the LUSH

23  brand is 2003, 2004, correct?

24       A.   Correct.

1      Q.   And these paragraphs critique Dr.

2   Joachimsthaler for not properly reviewing data and

3   opining on 2003 to 2004 specifically, correct?

4      A.   Correct.

5      Q.   Looking at paragraphs 19 through 20, is the

6   basis for your opinions in paragraphs 19 through 20,

7   is that based on your expertise in marketing or

8   simply the law provided by counsel?

9      A.   No.  I would say 19 and 20, again, what I'm

10   doing is all I'm doing is cataloguing all the data in

11   the Erich's report by time.

12      Q.   Um-hmm.

13      A.   So that's what I did.

14      Q.   And you did that based on the assumption that

15   2003 to 2004 is the relevant time period to look at

16   the LUSH brand for this framework?

17      A.   Yes.

18      Q.   But this cataloguing, that could be done by

19   anybody, it doesn't need to be a marketing expert,

20   correct?

21      A.   No.  I would say you would probably need to

22   have a level of marketing expertise to catalog the

23   right information under the right headings.  Right.

24   So brand as organization, brand as person.

 1      Q.  Understood.  Understood.

 2          But to create this table and to say that the

 3   data wasn't from 2003 to 2004, that doesn't take a

 4   marketing expert to do that specific task, correct?

 5   I could do that myself, right?

 6      A.  I'm going to say you need some level of

 7   expertise in marketing to do it.

 8      Q.  And why is that?

 9      A.  Again, because I think you need to evaluate

10   what he wrote in addition to the data he relied upon.

11      Q.  And where in paragraphs 19 and 20 are you

12   evaluating what Dr. Joachimsthaler wrote?

13      A.  So I'm taking his quotes and trying to

14   understand if he's talking about brand as

15   organization, what elements is he using in his report

16   that are tied to brand as organization, and then what

17   data is he using to support brand as organization.

18      Q.  Let's move to page 7, about the brand value

19   proposition.

20          Are you familiar with this framework?

21      A.  Yes.

22      Q.  In what way?

23      A.  So there's, again, a rich literature on the

24   elements of this framework in branding.

1     Q.  And had you -- prior to working on this case,

2  had you ever applied that framework before in your

3  report?

4     A.  So I've applied the elements of this

5  framework.

6     Q.  Each one of the elements?

7     A.  Yes.

8     Q.  And what's the difference between the brand

9  value propositions framework and the brand identity

10  system framework in your opinion?  When would you use

11  one versus the other?

12     A.  Well, I think they give you different -- they

13  give you different things.  So I think, you know, you

14  could use both, because there may not be a lot of

15  overlap, at least as listed by Erich and David Aaker

16  from their frameworks.

17     Q.  So you said they give you different things.

18        What does the brand value proposition, what

19  different conclusions does that reach, separate aside

20  from these reports in this case, just generally, what

21  different conclusions does the brand value

22  proposition framework reach as opposed to the brand

23  identity system framework?

24     A.  Again, I don't think the conclusions need to

 1  be different, they just have different elements.  So

 2  as we can see, functional, emotional,

 3  self-expressive, those are not picked up explicitly

 4  in the BIS.

 5      Q.  So they're just two different frameworks to

 6  kind of get to the same place?

 7      A.  Or at least could be applied in different

 8  ways.  They may or may not get you to the same place.

 9      Q.  So the brand value proposition framework

10  could also be used as a way to audit a brand?

11      A.  Yeah.  I would say as a way to evaluate a

12  brand.

13      Q.  Evaluate a brand.

14          And your opinions in this section of your

15  report are focused on the criticism that Dr.

16  Joachimsthaler's analysis of the brand value

17  proposition focuses on the wrong time frame; is that

18  correct?

19      A.  That's correct.

20      Q.  Anything else in this section of your report?

21          MR. CRANE:  Objection.

22  BY MS. KLIENBENSTEIN:

23      Q.  And I'll be specific for you.

24      A.  Thank you.

1  relates to this, correct.

2      Q.  Yeah.  I'm just trying to make sure we're on

3  the same page with the words that we're using.

4          So what the brand means, how it's viewed by

5  consumers, that's not the same thing as the strength

6  of the brand.  I understand they may be related.  But

7  they're not the same thing, right?

8      A.  I don't know if it's not the same thing.  I

9  mean, this was one framework in a Erich used to

10  assess strength of the brand.

11              THE WITNESS:  If it's okay, I'm

12          going to use the restroom only because

13          I didn't use it on the last break.

14              MS. KLIENBENSTEIN:  Sure.

15              THE WITNESS:  Thanks.

16              (Recess taken.)

17  BY MS. KLIENBENSTEIN:

18      Q.  Let's move to the third framework starting at

19  paragraph 43 on page 9.

20          Are you familiar with the framework that Dr.

21  Joachimsthaler used for analyzing whether the LUSH

22  brand is a lifestyle brand?

23      A.  So I'm familiar with lifestyle branding.

24      Q.  And the question is are you familiar with the

1    framework that he used to analyze whether LUSH is a

2    lifestyle brand?

3        A.  So I'm not really sure he used a framework.

4    I called it a framework because he called it a

5    framework.  But there are elements of a lifestyle

6    brand.  But, anyway.  So I'm familiar with lifestyle

7    brand.

8        Q.  Do you disagree with the elements that Dr.

9    Joachimsthaler used to analyze whether LUSH is a

10   lifestyle brand?  Setting aside the conclusions.

11       A.  No.  I think some of the elements he has in

12   there are probably elements you would want to

13   consider.

14       Q.  And looking at paragraphs 43 through 47, your

15   opinions in those paragraphs are that Dr.

16   Joachimsthaler used the wrong time frame again?

17       A.  That's correct.

18       Q.  That he should have analyzed whether LUSH was

19   a lifestyle brand in 2003, 2004, correct?

20       A.  Correct.

21       Q.  In paragraph 43, you used the phrase

22   "demanding criteria."

23           Do you see that?

24       A.  I do.

1              THE WITNESS:  Well, probably we

2        could come up with a list.  Right.  So

3        something like Pampers diapers,

4        probably a strong brand in that target

5        segment.  But as far as I know they

6        haven't extended to become a lifestyle

7        brand.

8              Again, similar, Nutella.  Probably

9        a relatively strong brand in some

10       certain markets, but as far as I know

11       they haven't extended to the Nutella

12       lifestyle.  We probably could do it for

13       a bunch of brands.

14   BY MS. KLIENBENSTEIN:

15     Q.  Understood.  So moving on to page 11, looking

16   at subsection 4.

17          When you're looking at whether a brand can

18   extend into different categories of products or

19   services, what framework do you use to make that

20   analysis?

21     A.  Again, I don't think that there's, you know,

22   a number of frameworks out there.  So, again, Erich

23   has -- and I labeled it as a framework.  But there's

24   elements that are here that are probably elements

1   that I would also use to look at is a brand

2   extendable.

3       Q.  So you don't have any quarrel with the

4   framework that Dr. Joachimsthaler used, correct?

5               MR. CRANE:  Objection.  Misstates

6       his testimony.

7   BY MS. KLIENBENSTEIN:

8       Q.  Just the conclusion.

9       A.  So I don't have a quarrel with the elements

10  and things that he used to understand, you know,

11  could a brand be able to extend.

12      Q.  And looking at paragraphs 48 through 53, your

13  critique in these paragraphs is that Dr.

14  Joachimsthaler analyzed the brand extension concept

15  in the wrong time period, correct?

16      A.  Correct.

17      Q.  No other opinions in this section, correct?

18      A.  No.

19      Q.  When you're analyzing the extendibility of

20  the brand, what data do you look at?

21      A.  So as I said, I would probably use similar

22  elements to Erich, and then try and collect secondary

23  and primary data to see if there's, you know, the

24  ability to extend is there.

```
 1              different analysis for a different

 2              brand may come up with a different

 3              conclusion.

 4                   MS. KLIENBENSTEIN:  I don't think

 5              I have any other questions.  Let me

 6              double check.  All right.  That's all

 7              that I have.

 8                   THE WITNESS:  Thank you.

 9                   (discussion off the record.)

10                   MS. KLIENBENSTEIN:  So we're going

11              to allow the witness to read and sign,

12              and he'll do so within a two-week turn

13              around time after when he gets the

14              final transcript.

15                   MR. CRANE:  All right.

16                   (WHEREUPON, the deposition was concluded

17                   at 1:40.)

18

19

20

21

22

23

24
```

```
 1               C E R T I F I C A T E

 2

 3          COMMONWEALTH OF MASSACHUSETTS)

 4          ESSEX, SS.                   )

 5

 6      I, Maria P. Manning, CSR and Notary Public in

 7  and for the Commonwealth of Massachusetts, do hereby

 8  certify that there came before me on the 21st day of

 9  October, 2016, at 10:03 a.m., the person hereinbefore

10  named was duly sworn by me and that such deposition

11  is a true record of the testimony given by the

12  witness.

13      I further certify that I am neither related to

14  nor employed by any of the parties or counsel to this

15  action, nor am I financially interested in the

16  outcome of this action.

17      In witness whereof, I have hereunto set my hand

18  and seal this 4th day of November, 2016.

19

20

21                        _____

22                        Notary Public

23                        My Commission Expires

24                        January 6, 2017
```

1      ERRATA SHEET DISTRIBUTION INFORMATION

2      DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

3

4        ERRATA SHEET DISTRIBUTION INFORMATION

5

6        The original of the Errata Sheet has been

7   delivered to David A. Crane, Esq.

8        When the Errata Sheet has been completed by the

9   deponent and signed, a copy thereof should be

10   delivered to each party of record and the ORIGINAL

11   forwarded to Heather J. Kliebenstein, Esq., to whom

12   the original deposition transcript was delivered.

13

14             INSTRUCTIONS TO DEPONENT

15        After reading this volume of your deposition,

16   please indicate any corrections or changes to your

17   testimony and the reasons therefor on the Errata

18   Sheet supplied to you and sign it.  DO NOT make marks

19   or notations on the transcript volume itself.  Add

20   additional sheets if necessary.  Please refer to the

21   above instructions for Errata Sheet distribution

22   information.

23

24

```
1   ATTACH TO DEPOSITION OF: DR. JONATHAN D. HIBBARD
2   CASE:  Pinkette Clothing, Inc. Vs. Cosmetic Warriors
3   Limited
4   DATE TAKEN:  10/21/2016
5                       ERRATA SHEET
6   Please refer to Page 117 for Errata Sheet
7   instructions and distribution instructions.
8   Page Line                 Correction/Reason
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  I have read the foregoing transcript of my
19  deposition, and except for any corrections or changes
20  noted above, I hereby subscribe to the transcript as
21  an accurate record of the statements made by me.
22  Executed this_____day of_____, 2016.
23                  _____
24                      DR. JONATHAN D. HIBBARD
```